# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 24, 2008      Decided February 18, 2009

No. 08-5424

JAMAL KIYEMBA, NEXT FRIEND, ET AL.,
APPELLEES

v.

BARACK H. OBAMA, PRESIDENT OF THE UNITED STATES, ET
AL.,
APPELLANTS

Consolidated with 08-5425, 08-5426, 08-5427, 08-5428,
08-5429

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-mc-00442)

*Gregory G. Garre*, Solicitor General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Gregory G. Katsas*, Assistant Attorney General, *Jonathan F. Cohn*, Deputy Assistant Attorney General, and *Robert E. Kopp*, *Thomas M. Bondy*, *Anne Murphy*, and *Sharon Swingle*, Attorneys. *Scott R. McIntosh*, Attorney, entered an appearance.

*Sabin Willett* argued the cause for appellees. With him on the brief were *Rheba Rutkowski*, *Neil McGaraghan*, *Jason S. Pinney*, *Susan Baker Manning*, *George Clark*, *Eric A. Tirschwell*, *Michael J. Sternhell*, *Darren LaVerne*, *Seema Saifee*, *Elizabeth P. Gilson*, *J. Wells Dixon*, and *Angela C. Vigil*.

*Howard Schiffman* was on the brief for *amicus curiae* Uyghur American Association in support of appellees.

*Lucas Guttentag* and *Theodore D. Frank* were on the brief of law professors as *amici curiae*, addressing *Shaughnessy v. United States ex rel. Mezei* and *Clark v. Martinez*, and supporting affirmance.

*Alex Young K. Oh* and *Aziz Huq* were on the brief for *amici curiae* Brennan Center for Justice at NYU School of Law, et al. in support of appellees.

*David Overlock Stewart* were on the brief for *amici curiae* Legal and Historical Scholars in support of appellees.

*Thomas A. Gottschalk* was on the brief for *amici curiae* National Immigration Justice Center, et al. in support of appellees.

Before: HENDERSON and ROGERS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in the judgment filed by *Circuit Judge* ROGERS.

RANDOLPH, *Senior Circuit Judge*: Seventeen Chinese citizens currently held at Guantanamo Bay Naval Base, Cuba, brought petitions for writs of habeas corpus. Each petitioner is an ethnic Uighur, a Turkic Muslim minority whose members reside in the Xinjiang province of far-west China. The question is whether, as the district court ruled, petitioners are entitled to an order requiring the government to bring them to the United States and release them here.

Sometime before September 11, 2001, petitioners left China and traveled to the Tora Bora mountains in Afghanistan, where they settled in a camp with other Uighurs. *Parhat v. Gates*, 532 F.3d 834, 837 (D.C. Cir. 2008). Petitioners fled to Pakistan when U.S. aerial strikes destroyed the Tora Bora camp. *Id.* Eventually they were turned over to the U.S. military, transferred to Guantanamo Bay and detained as "enemy combatants."[1]

Evidence produced at hearings before Combatant Status Review Tribunals in Guantanamo indicated that at least some petitioners intended to fight the Chinese government, and that they had received firearms training at the camp for this purpose. *See Parhat*, 532 F.3d at 838, 843. The Tribunals determined that the petitioners could be detained as enemy combatants because the camp was run by the Eastern Turkistan Islamic

---

[1] An "enemy combatant" is "an individual who was part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." *Parhat*, 532 F.3d at 838 (quoting Deputy Secretary, U.S. Dep't of Defense, Order Establishing Combatant Status Review Tribunal at 1 (July 7, 2004); Secretary, U.S. Navy, Implementation of Combatant Status Review Tribunal Procedures at E-1 § B (July 29, 2004)).

Movement, a Uighur independence group the military believes to be associated with al Qaida or the Taliban, *see id.* at 844, and which the State Department designated as a terrorist organization three years after the petitioners' capture, *see* 69 Fed. Reg. 23,555-01 (April 29, 2004).

In the *Parhat* case, the court ruled that the government had not presented sufficient evidence that the Eastern Turkistan Islamic Movement was associated with al Qaida or the Taliban, or had engaged in hostilities against the United States or its coalition partners. *Parhat*, 532 F.3d at 850. Parhat therefore could not be held as an enemy combatant. The government saw no material differences in its evidence against the other Uighurs, and therefore decided that none of the petitioners should be detained as enemy combatants.

Releasing petitioners to their country of origin poses a problem. Petitioners fear that if they are returned to China they will face arrest, torture or execution. United States policy is not to transfer individuals to countries where they will be subject to mistreatment. Petitioners have not sought to comply with the immigration laws governing an alien's entry into the United States. Diplomatic efforts to locate an appropriate third country in which to resettle them are continuing. In the meantime, petitioners are held under the least restrictive conditions possible in the Guantanamo military base.

As relief in their habeas cases, petitioners moved for an order compelling their release into the United States. Although the district court assumed that the government initially detained petitioners in compliance with the law, *In re Guantanamo Bay Detainee Litig.*, No. 05-1509, Memorandum Opinion at 5 (D.D.C. Oct. 9, 2008) ("Mem. Op."), the court thought the government no longer had any legal authority to hold them, *id.* at 9. As to the appropriate relief, the court acknowledged that

historically the authority to admit aliens into this country rested exclusively with the political branches. *Id.* at 11–12. Nevertheless, the court held that the "exceptional" circumstances of this case and the need to safeguard "an individual's liberty from unbridled executive fiat," justified granting petitioners' motion.[2] *Id.* at 12, 15.

Our analysis begins with several firmly established propositions set forth in *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1158 (D.C. Cir. 1999), from which we borrow. There is first the ancient principle that a nation-state has the inherent right to exclude or admit foreigners and to prescribe applicable terms and conditions for their exclusion or admission.[3] This principle, dating from Roman times,[4] received recognition during the Constitutional Convention[5] and has continued to be

---

[2] The district court granted the motion on October 8, 2008, and set a hearing date one week later to determine what conditions, if any, it would impose on petitioners. *In re Guantanamo Bay Detainee Litig.*, 05-1509, Order at 2 (D.D.C. Oct. 8, 2008) ("Order"). The same day, the government moved for, and this court granted, an emergency stay of judgment. This court later granted a full stay of judgment pending appeal and ordered expedited briefing of the government's appeal.

[3] *See, e.g.*, *Ekiu v. United States*, 142 U.S. 651, 659 (1892); *Harisiades v. Shaughnessy*, 342 U.S. 580, 596 (1952) (Frankfurter, J., concurring); Clement Lincoln Bouvé, *Exclusion and Expulsion of Aliens* 4 & n.3 (1912), and authorities there cited; II Emmerich de Vattel, *Le Droit Des Gens* §§ 94, 100 (1758).

[4] Edwin M. Borchard, *The Diplomatic Protection of Citizens Abroad* 33, 44–48 (1915).

[5] *See* 3 *The Papers of James Madison* 1277 (J.C.A. Stagg et al. eds., 1996), in which Madison reports Gouverneur Morris' observation during the debates that "every Society from a great nation

6

an important postulate in the foreign relations of this country and other members of the international community.[6]

For more than a century, the Supreme Court has recognized the power to exclude aliens as "'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers – a power to be exercised exclusively by the political branches of government'"[7] and not "granted away or restrained on behalf of any one." *The Chinese Exclusion Case*, 130 U.S. 581, 609 (1889). Ever since the decision in the *Chinese Exclusion Case*, the Court has, without exception, sustained the

---

down to a club ha[s] the right of declaring the conditions on which new members should be admitted." Article I, Section 9, Clause 1, of the Constitution itself is an implicit recognition of Congress' authority to regulate immigration. In addition, Article III of the Jay Treaty of 1794, 8 Stat. 116, 117, provided that British and American subjects could freely cross the Canadian border. *See Karmuth v. United States*, 279 U.S. 231, 235–36 (1929). As to the Colonial understanding of the sovereign's power to control the admission of aliens, *see* Thomas Jefferson, *Notes on the State of Virginia* 83–85 (William Peden ed. 1955).

[6] *See Hines v. Davidowitz*, 312 U.S. 52, 62–65 (1941); *Convention Between the United States of America and other American Republics regarding the status of aliens* art. I, 46 Stat. 2753 (1928); Constitution of the Intergovernmental Committee for European Migration pmbl., 6 *United States Treaties and Other International Agreements* 603 (1953); III Green Haywood Hackworth, *Digest of International Law* 725–29 (1942); Borchard, *supra* note 4, at 44–48; William Edward Hall, *International Law* 211–12 (6th ed. 1909); IV John Bassett Moore, *A Digest of International Law* 151–74 (1906).

[7] *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (quoting the Solicitor General's brief); *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977).

exclusive power of the political branches to decide which aliens may, and which aliens may not, enter the United States, and on what terms. *See, e.g.*, *Ekiu*, 142 U.S. at 659; *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893); *Lem Moon Sing v. United States*, 158 U.S. 538, 543, 547 (1895); *Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *Fok Yung Yo v. United States*, 185 U.S. 296, 302 (1902); *Tiaco v. Forbes*, 228 U.S. 549, 556–57 (1913); *Hines*, 312 U.S. at 62–64; *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *Galvan v. Press*, 347 U.S. 522, 530 (1954); *Graham v. Richardson*, 403 U.S. 365, 377 (1971); *Kleindienst*, 408 U.S. at 765–66; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Fiallo*, 430 U.S. at 792; *Reno v. Flores*, 507 U.S. 292, 305–06 (1993); *Demore v. Kim*, 538 U.S. 510, 521–22 (2003).

With respect to the exclusive power of the political branches in this area, there is, as the Supreme Court stated in *Galvan*, "not merely 'a page of history,' . . . but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government." 347 U.S. at 531 (quoting *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). Justice Frankfurter summarized the law as it continues to this day: "Ever since national States have come into being, the right of the people to enjoy the hospitality of a State of which they are not citizens has been a matter of political determination by each State" – a matter "wholly outside the concern and competence of the Judiciary." *Harisiades*, 342 U.S. at 596 (concurring opinion).

As a result, it "is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Knauff*, 338 U.S. at 543. With respect to these seventeen petitioners, the Executive Branch has determined not to allow

them to enter the United States.[8]  The critical question is: what law "expressly authorized" the district court to set aside the decision of the Executive Branch and to order these aliens brought to the United States and released in Washington, D.C.?

The district court cited no statute or treaty authorizing its order, and we are aware of none.  As to the Constitution, the district court spoke only generally.  The court said there were "constitutional limits," that there was some "constitutional imperative," that it needed to protect "the fundamental right of liberty."  These statements suggest that the court may have had the Fifth Amendment's due process clause in mind.  *See Troxel v. Granville*, 530 U.S. 57, 65 (2000).  But the due process clause cannot support the court's order of release.  Decisions of the Supreme Court and of this court – decisions the district court did not acknowledge – hold that the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States.[9]  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269, 274–75 (1990); *Johnson v. Eisentrager*, 339 U.S. 763, 783–84 (1950); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *Harbury v. Deutch*, 233 F.3d 596, 603–04 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002); *People's*

---

[8] We express no opinion on whether the Executive Branch may ignore the immigration laws and release petitioners into the United States without the consent of Congress.

[9] The Guantanamo Naval Base is not part of the sovereign territory of the United States.  Congress so determined in the Detainee Treatment Act of 2005 § 1005(g), 119 Stat. 2743.  The Immigration and Nationality Act, *see* 8 U.S.C. § 1101(a)(38), also does not treat Guantanamo as part of the United States.  *See also Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380 (1948).

*Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999); *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) (per curiam).  The district court, no less than a panel of this court, must follow those decisions.  *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

The district court also sought to support its order by invoking the idea embodied in the maxim *ubi jus, ibi remedium* – where there is a right, there is a remedy.  *See Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*, 955 F.2d 67, 73 (D.C. Cir. 1992).[10]  We do not believe the maxim reflects federal statutory or constitutional law.  *See id.*  Not every violation of a right yields a remedy, even when the right is constitutional.  *See Wilkie v. Robbins*, 127 S. Ct. 2588, 2597–98 (2007).  Application of the doctrine of sovereign immunity to defeat a remedy is one common example.  *See Alden v. Maine*, 527 U.S. 706, 754 (1999).  Another example, closer to this case,[11] is application of the political question doctrine.  *See Webster v. Doe*, 486 U.S. 592, 612–13 (1988) (Scalia, J., dissenting).  More than that, the right–remedy dichotomy is not so clear-cut.  As Justice Holmes warned, "[s]uch words as 'right' are a constant solicitation to fallacy."  *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922).  *Ubi jus, ibi remedium* cannot tell us whether petitioners have a right to have a court order their release into the United States.  Whatever the force of this maxim, it cannot overcome established law that an "alien

---

[10] Some have argued that the maxim is part of the due process guaranteed by the Constitution.  *See, e.g.,* Tracy A. Thomas, *Ubi Jus, Ibi Remedium: The Fundamental Right to a Remedy Under Due Process*, 41 SAN DIEGO L. REV. 1633 (2004).  If so, petitioners cannot take advantage of it, for reasons we have already given.

[11] "Questions, in their nature political, . . . can never be made in this court."  *Marbury v. Madison*, 1 Cranch 137, 170 (1803).

who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such a privilege is granted to an alien only upon such terms as the United States shall prescribe." *Knauff*, 338 U.S. at 542.

Much of what we have just written served as the foundation for the Supreme Court's opinion in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), a case analogous to this one in several ways. The government held an alien at the border (Ellis Island, New York). He had been denied entry into the United States under the immigration laws. But no other country was willing to receive him. The Court ruled that the alien, who petitioned for a writ of habeas corpus, had not been deprived of any constitutional rights. *Id.* at 215. In so ruling the Court necessarily rejected the proposition that because no other country would take Mezei, the prospect of indefinite detention entitled him to a court order requiring the Attorney General to release him into the United States. As the Supreme Court saw it, the Judiciary could not question the Attorney General's judgment. *Id.* at 212.

Neither *Zadvydas*, 533 U.S. 678, nor *Clark v. Martinez*, 543 U.S. 371 (2005), are to the contrary. Petitioners are incorrect in viewing these cases as holding that the constitutional "liberty interests of concededly illegal aliens trumps [sic] statutory detention power pending exclusion once that detention becomes indefinite." Pet'rs' Br. 29. Both cases rested on the Supreme Court's interpretation, not of the Constitution, but of a provision in the immigration laws – a provision, the Court acknowledged, Congress had the prerogative of altering.[12] *See Clark*, 543 U.S.

---

[12] It would therefore be wrong to assert that, by ordering aliens paroled into the country in *Zadvydas* and *Clark*, the Court somehow undermined the plenary authority of the political branches over the

at 386. It is true that *Zadvydas* spoke of an alien's due process rights, but the Court was careful to restrict its statement to aliens who had already entered the United States. 533 U.S. at 693. It was on that ground that the Court distinguished *Mezei*. *Id.* The distinction is one that "runs throughout immigration law." *Id.* The Court stated: "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Id.* (citing *Verdugo-Urquidez*, 494 U.S. at 269; *Eisentrager*, 339 U.S. at 784).

And so we ask again: what law authorized the district court to order the government to bring petitioners to the United States and release them here? It cannot be that because the court had habeas jurisdiction, *see Boumediene v. Bush*, 128 S. Ct. 2229 (2008), it could fashion the sort of remedy petitioners desired. The courts in *Knauff* and in *Mezei* also had habeas jurisdiction, yet in both cases the Supreme Court held that the decision whether to allow an alien to enter the country was for the political departments, not the Judiciary. Petitioners and the amici supporting them invoke the tradition of the Great Writ as a protection of liberty. As part of that tradition, they say, a court with habeas jurisdiction has always had the power to order the prisoner's release if he was being held unlawfully. But as in *Munaf v. Geren*, 128 S. Ct. 2207, 2221 (2008), petitioners are not seeking "simple release." Far from it. They asked for, and received, a court order compelling the Executive to release them into the United States outside the framework of the immigration

---

entry and admission of aliens. The point is that Congress has set up the framework under which aliens may enter the United States. The Judiciary only possesses the power Congress gives it – to review Executive action taken within that framework. Since petitioners have not applied for admission, they are not entitled to invoke that judicial power.

laws. Whatever may be the content of common law habeas corpus, we are certain that no habeas court since the time of Edward I ever ordered such an extraordinary remedy.[13]

An undercurrent of petitioners' arguments is that they deserve to be released into this country after all they have endured at hands of the United States. But such sentiments, however high-minded, do not represent a legal basis for upsetting settled law and overriding the prerogatives of the political branches. We do not know whether all petitioners or any of them would qualify for entry or admission under the immigration laws.[14] We do know that there is insufficient

---

[13] Petitioners observe that "the Executive has cited no decision in which a federal court has withheld a remedy from a civilian held in a military prison indefinitely, and without charge, when that civilian is within its jurisdiction and enjoys the constitutional privilege of habeas corpus." Pet'rs' Br. 38. But petitioners seek an extraordinary remedy. We therefore think it more significant that petitioners have cited no case in which a federal court ordered the Executive to bring an alien into the United States and to release him here, when the alien was held outside our sovereign territory and had not even applied for admission under the immigration laws.

[14] The government asserts that petitioners would not qualify for admission under the immigration laws. Gov't Br. 27–29. They would need visas, 8 U.S.C. § 1182(a)(7)(A), (B), which they do not have, and a court could not order the Executive Branch to grant them visas. *Saavedra Bruno*, 197 F.3d at 1160. The government also suggests that petitioners are ineligible for another reason – even though the United States was not their target, they allegedly engaged in "terrorist activity" within the meaning of 8 U.S.C. § 1182(a)(3)(B)(i)(I), which would mandate their removal under 8 U.S.C. § 1225(c)(1). Petitioners object that the evidence is insufficient to back up the government's claim. *See* Pet'rs' Br. 28. The dispute cannot be resolved at this stage. Petitioners have not applied for admission pursuant to the immigration laws; the

evidence to classify them as enemy combatants – enemies, that is, of the United States.  But that hardly qualifies petitioners for admission.  Nor does their detention at Guantanamo for many years entitle them to enter the United States.  Whatever the scope of habeas corpus, the writ has never been compensatory in nature.  *See Heck v. Humphrey*, 512 U.S. 477, 481 (1994); *Preiser v. Rodriguez*, 411 U.S. 475, 493 (1973).  The government has represented that it is continuing diplomatic attempts to find an appropriate country willing to admit petitioners, and we have no reason to doubt that it is doing so.  Nor do we have the power to require anything more.

***

We have the following response to Judge Rogers's separate opinion.

1. **Judge Rogers: "The power to grant the writ means the power to order release."** Sep. Op. at 10.

No matter how often or in what form Judge Rogers repeats this undisputed proposition – and repeat it she does –  it will not move us any closer to resolving this case.  The question here is not whether petitioners should be released, but where.  That question was not presented in *Boumediene* and the Court never addressed it.  As we wrote earlier, *supra* at 11–12,  never in the history of habeas corpus has any court thought it had the power to order an alien held overseas brought into the sovereign territory of a nation and released into the general population.  As

---

immigration authorities therefore have made no formal determination of their immigration status.  *See id.* § 1225(a)(1).  For the same reason, petitioners are not entitled to parole under 8 U.S.C. § 1182(d)(5)(A), a remedy that can be granted only to an applicant for admission and only in the exclusive discretion of the Secretary of Homeland Security.

we have also said, in the United States, who can come in and on what terms is the exclusive province of the political branches. In response, Judge Rogers has nothing to say.

2. **Judge Rogers: "[T]he district court erred by ordering release into the country without first ascertaining whether the immigration laws provided a valid basis for detention as the Executive alternatively suggested."** Sep. Op. at 4.

This statement, and others like it throughout the separate opinion, is confused and confusing. First of all, the government has never asserted, here or in the district court, that it is holding petitioners pursuant to the immigration laws. None of the petitioners has violated any of our immigration laws. How could they? To presume otherwise – as Judge Rogers does throughout her separate opinion, *e.g.*, *id.* at 1, 4, 5, 6, 13 – is strange enough.

Stranger still, Judge Rogers charges the district court with acting "prematurely" in ordering petitioners' release into the United States. Sep. Op. at 1, 13. How so? As she sees it, the district court should have first determined whether, under the immigration laws, petitioners were eligible to enter the country or were excludable. But no one – not the government, not petitioners, not the amici – no one suggested that the court should, or could, make any such determination.

What then is Judge Rogers talking about when she insists on evaluating petitioners' eligibility for admission under the immigration laws? None of the petitioners has even applied for admission. Perhaps she thinks a court should decide which, if any, of the petitioners would have been admitted if they had applied. But deciding that at this stage is impossible. A brief survey of immigration law shows why.

15

Eligibility turns in part on what status the alien is seeking. The immigration laws presume that those applying for entry seek permanent resident status. Such persons must first obtain an immigrant visa from a consular officer. 8 U.S.C. § 1101(a)(16). But the consular officer can only act after a petition is filed with the Secretary of Homeland Security, showing the immigrant status for which the alien qualifies. *Id.* §§ 1153(f), 1154. The consular officer then has the exclusive authority to make the final decision about the issuance of any such immigrant visa. *Id.* §§ 1104(a), 1201(a)(1)(A). That decision is not judicially reviewable. *Saavedra Bruno*, 197 F.3d at 1158.

Worldwide limits on immigration are set out in 8 U.S.C. § 1151. Additionally, there are limitations on the number of visas that can be issued to immigrants from any one particular country. *Id.* § 1152. Immigrants are divided into three categories: family-sponsored immigrants, *id.* § 1153(a); employment-based immigrants, *id.* § 1153(b); and diversity immigrants, *id.* § 1153(c). For employment-based immigrants, first preference is given to "priority workers," which include aliens with extraordinary ability in sciences, arts, education, business, or athletics, *id.* § 1153(b)(1)(A); "outstanding professors and researchers," *id.* § 1153(b)(1)(B); and "certain multinational executives and managers," *id.* § 1153(b)(1)(C). There are lower preference categories unnecessary to set forth.

Suppose the eligibility of any of the petitioners was determined on the basis that they were seeking only temporary admission. Here again, to be admitted as a nonimmigrant in any of the categories set forth in the margin,[15] the alien must

---

[15] Some general classes of nonimmigrants are: career diplomats, 8 U.S.C. § 1101(a)(15)(A); temporary visitors for business or pleasure, *id.* § 1101(a)(15)(B); aliens in transit, *id.*

apply for a visa. 8 U.S.C. § 1201(a)(1)(B). Different classes have different requirements for what the alien must do to obtain a visa, but all require that the alien submit some form.

Suppose the petitioners' eligibility for admission turned on whether they could be considered refugees or asylum seekers. An alien seeking refugee or asylum status (refugees apply from abroad; asylum applicants apply when already here) must qualify as a "refugee" as defined in 8 U.S.C. § 1101(a)(42). Whether they could be admitted under this heading depends on numerical limitations established by the President, and on the discretion of the Attorney General or the Secretary of Homeland Security. To qualify as a refugee, an alien must (1) not be firmly resettled in a foreign country, (2) be of "special humanitarian concern" to the United States, and (3) be admissible as an immigrant under the immigration laws. *Id.* § 1157(c)(1). Although the Attorney General and the Secretary are given discretion to waive many of the grounds of inadmissibility for a refugee applicant, the statute specifically prohibits waiver of the "terrorist activity" ground. *Id.* § 1157(c)(3); *see also supra* at 12 n.14.

The parole remedy, 8 U.S.C. § 1182(d)(5)(A), not only is granted in the exclusive discretion of the Secretary of Homeland Security, but also is specifically limited to "any alien applying for admission." The section also provides that no alien who

---

§ 1101(a)(15)(C); ship or airplane crew members, *id.* § 1101(a)(15)(D); students, *id.* § 1101(a)(15)(F); temporary workers, *id.* § 1101(a)(15)(H); aliens with extraordinary abilities, *id.* § 1101(a)(15)(O); entertainers and athletes, *id.* § 1101(a)(15)(P); religious workers, *id.* § 1101(a)(15); and individuals coming to provide information on a terrorist organization or for a criminal investigation, *id.* § 1101(a)(15)(S).

would more properly be considered a refugee should be paroled unless the Secretary specifically determines that "compelling reasons in the public interest" argue in favor of the parole remedy.

There are many more complications, but the bottom line is clear. Aliens are not eligible for admission into the United States unless they have applied for admission. Numerical limits may render them ineligible, as may many other considerations. The Secretary has wide discretion with respect to several categories of applicants and the decisions of consular officers on visa applications are not subject to judicial review. And so we find it impossible to understand what Judge Rogers is thinking when she insists, for instance, that "the district court erred by ordering release into the country without first ascertaining whether the immigration laws provided a valid basis for detention" of someone who (a) has never entered or attempted to enter the country, and (b) has never applied for admission under the immigration laws.

3. **Judge Rogers: "[T]he majority has recast the traditional inquiry of a habeas court from whether the Executive has shown that the detention of the petitioners is lawful to whether the petitioners can show that the habeas court is 'expressly authorized' to order aliens brought into the United States."** Sep. Op. at 9.

Judge Rogers fails to mention that the "expressly authorized" quotation in our opinion is taken from a Supreme Court opinion in a habeas case. We repeat with some additional emphasis: it "is **not within the province of any court, unless expressly authorized by law**, to review the determination of the political branch of the Government to exclude a given alien." *Knauff*, 338 U.S. at 543. When Judge Rogers finally confronts *Knauff*, how does she deal with the Supreme Court's opinion?

She calls it an "outlier," as if her label could erase the case from the United States Reports. We know and she knows that the lower federal courts may not disregard a Supreme Court precedent even if they think that later cases have weakened its force. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). With respect to *Knauff*, later cases have reinforced, not lessened, its precedential value. *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 32, 34 (1982); *Mezei*, 345 U.S. at 212.

4. **Judge Rogers: "[T]he majority has mischaracterized relevant precedent."** Sep. Op. at 11.

Judge Rogers is referring to our discussion of the Supreme Court decisions in *Clark* and *Zadvydas*. We made two points about the cases. The first was that both rested on statutory provisions that are not involved here. Judge Rogers acknowledges the correctness of our view. Our second point was that as far as a court's releasing an alien into the country temporarily pursuant to statutory authority, there was a clear distinction between aliens within the United States and those "outside our geographic borders." *Zadvydas*, 533 US. at 693. How does Judge Rogers deal with this distinction? She claims that *Boumediene* "rejected this territorial rationale as to Guantanamo." Sep. Op. at 11. But as the Court recognized, it had never extended any constitutional rights to aliens detained outside the United States; *Boumediene* therefore specifically limited its holding to the Suspension Clause. 128 S. Ct. at 2262.

\*\*\*

The judgment of the district court is reversed and the cases are remanded for further proceedings consistent with this opinion.

*So Ordered.*

ROGERS, *Circuit Judge*, concurring in the judgment: In *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Supreme Court held that detainees in the military prison at Guantanamo Bay ("Guantanamo") are "entitled to the privilege of habeas corpus to challenge the legality of their detentions," *id.* at 2262, and that a "habeas court must have the power to order the conditional release of an individual unlawfully detained," *id.* at 2266. Today the court nevertheless appears to conclude that a habeas court lacks authority to order that a non-"enemy combatant" alien be released into the country (as distinct from be admitted under the immigration laws) when the Executive can point to no legal justification for detention and to no foreseeable path of release. I cannot join the court's analysis because it is not faithful to *Boumediene* and would compromise both the Great Writ as a check on arbitrary detention and the balance of powers over exclusion and admission and release of aliens into the United States recognized by the Supreme Court to reside in the Congress, the Executive, and the habeas court. Furthermore, that conclusion is unnecessary because this court cannot yet know if detention is justified here. Due to the posture of this case, the district court has yet to hear from the Executive regarding the immigration laws, which the Executive had asserted may form an alternate basis for detention. The district court thus erred in granting release prematurely, and I therefore concur in the judgment.

## I.

The Executive chose not to file returns to the petitions for writs of habeas corpus for a majority of the petitioners. After several hearings and briefing, the district court determined that the Executive neither claimed petitioners were "enemy combatants" or otherwise dangerous, nor charged them with a crime, nor pointed to other statutory grounds for detention, nor presented reliable evidence that they posed a threat to U.S. interests. *In re Guantanamo Bay Detainee Litig.*, Misc. No.

08-442, Mem. Op. at 4, 12 (D.D.C. Oct. 9, 2008) ("2008 Mem. Op."). The Executive also did not deny it detained the petitioners.[1] The district court understood the Executive to argue instead that it had extra-statutory "wind-up" authority to repatriate petitioners[2] and that the district court in any case

---

[1] The majority opinion accepts the Executive's assertion on brief that "petitioners are held under the least restrictive conditions possible in the Guantanamo military base." Maj. Op. at 4, 13; Appellants' Br. at 9. This means, according to the uncontested allegations of petitioners, that they are still held in a high-security prison with no contact with family, friends, or news from the outside world, aside from sporadic visits from attorneys — during which detainees are at least sometimes chained to the floor — and the Red Cross. *See* Appellees' Br. at 8-9.

[2] The Executive argues this stems from the practice in past wars to detain prisoners of war ("POWs") beyond the end of a conflict in order to arrange repatriation, as occurred, for example, with respect to German POWs held within the continental United States during World War II. The majority does not discuss this "wind up authority," so I note only that both the Geneva Conventions and U.S. Army policy require repatriation of POWs "without delay." The Geneva Convention (III) Relative to the Treatment of Prisoners of War, Art. 118, *ratified* July 14, 1955, 6 U.S.T. 3316, T.I.A.S. No. 3364; DEPT. OF THE ARMY, THE LAW OF LAND WARFARE, FIELD MANUAL 27-10 at ¶ 71(d) (1957) (instituting verbatim Geneva Convention III Art. 118). In the first Gulf War, for example, all POWs – over 80,000 – were repatriated or granted refugee status within Saudi Arabia within six months of the cessation of hostilities. U.S. Dep't of Def., Final Report to Congress: Conduct of the Persian Gulf War at *662, *671-72 (Apr. 1992), available at http://www.ndu.edu/library/epubs/cpgw.pdf. By contrast, these seventeen petitioners, who have not been treated as POWs, have been imprisoned at Guantanamo for over seven years, and, as the district court determined, the Executive's unsuccessful efforts to locate a suitable country for release had been on-going for more than five years and "[petitioners'] detention has become

lacked the authority to order them released into the United States. *Id.* at 4. Rejecting both of these rationales — the first in view of the years in which the Executive had unsuccessfully sought to find a country that would receive the petitioners without risk of their being tortured,[3] *id.* at 8-9, the second in view of *Boumediene* and the need to afford an effective habeas remedy, *id.* at 15-16 — the district court granted the petitions, which sought release into the country. Ruling the Executive had shown no lawful basis for what had become indefinite detention, the district court concluded petitioners must be brought before the court and released. *Id.* at 9, 17.

However, in the district court the Executive had also pointed to a possible separate ground for detention that the district court did not resolve — namely that petitioners were excludable under the immigration statutes and could be detained pending removal proceedings. Mot. Status Hr'g Tr. at 15, 44-45 (citing 8 U.S.C. § 1182(a)(3)(B) (aliens engaging in terrorist activities inadmissible)), 52-53, 57-58 (discussing 8 U.S.C. §

---

effectively indefinite." 2008 Mem. Op. at 8-9.

[3] The majority understates the extent to which there is no other viable country to which these petitioners can go. Maj. Op. at 4. It is not only petitioners who fear they would be tortured if returned to their homeland of China; former Navy Secretary Gordon England and former Secretary of State Colin Powell confirmed as much, and the Executive has never disputed that proposition, even in this litigation. And, while the majority states it is the "policy" of the United States not to render people into countries in which they will be subject to torture or other mistreatment, *id.*, that is also the legal obligation of the United States as a signatory to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *signed* Apr. 18, 1988, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. Nothing in the Executive's filings under seal on January 16 and 28, 2009 has changed the situation.

1182) (Oct. 7, 2008) ("Oct. 2008 Mot. Hr'g"). The Executive had also sought a stay so it could evaluate petitioners' status under the immigration laws and present the views of the Department of Homeland Security,[4] *id*. at 44-45. The district court declined to stay the proceedings, noting that petitioners had already been imprisoned for seven years and delay had been "the name of the game" in the Executive's litigation strategy. *Id.* at 47, 59. Instead the district court ordered the petitioners immediately released into the United States,[5] with a hearing to follow a week later at which time the position of Homeland Security could be presented, *id.* at 59-60. At that time, the district court intended to consider conditions for petitioners' continued release, *id.* The district court also purported to restrain the Executive from taking petitioners into custody pursuant to the immigration statutes during the week prior to the hearing, *id*. at 48, 60.

In so proceeding, the district court erred by ordering release into the country without first ascertaining whether the immigration laws provided a valid basis for detention as the Executive alternatively suggested. *See Boumediene*, 128 S. Ct.

---

[4] *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 101, 441-478, 116 Stat. 2135, 2142, 2192-2212 (codified at 6 U.S.C. §§ 111, 251-298) (establishing Department of Homeland Security and vesting in it responsibility for border security and immigration).

[5] Petitioners were to be released in accordance with a detailed plan, developed with Lutheran Immigration and Refugee Services, the president of the World Uighur Congress, and others for their housing with Uighur families in the area, transportation, financial support, and care. *See* Oct. 2008 Mot. Hr'g Tr. at 49-52, 63. They acknowledged through counsel that conditions for bringing them into the country presented issues for the Department of Homeland Security. *Id*. at 52.

at 2266.  The court seems to have relied on *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *Clark v. Martinez*, 543 U.S. 371 (2005), for the proposition that petitioners could no longer be detained, *see* 2008 Mem. Op. at 8.  But in those cases the Supreme Court first assessed the Executive's arguments that it had the right to detain under the immigration statutes before finding that power had expired and ordering release.  *Clark*, 543 U.S. at 386-87; *Zadvydas*, 533 U.S. at 699.  In so doing, the Court gave effect to both the province of the Great Writ as a check on unjustified detention and the power of the political branches over exclusion and admission of aliens into the country.  *See Zadvydas*, 533 U.S. at 695 (noting that purported "plenary powers" of Congress to create immigration law are "subject to important constitutional limitations"); *see Clark*, 543 U.S. at 384.  To instead order release before assessing asserted legal authority for detention is incompatible with the obligation of a habeas court.  *See infra*, Part II.  Even if the Executive's delay in raising the immigration statutes as a basis for detention appears troubling given its opportunity to file returns to the writs, as the petitioners asserted they did not seek an immigration remedy, Oct. 2008 Mot. Hr'g Tr. at 7, the Executive cannot have waived the argument when it raised the argument in response to the district court's rejection of its other rationales for detention.

Because the district court could not properly order release into this country when it could not yet know whether detention was justified, I concur in the judgment vacating the release order.  Because the question of whether the immigration statutes provide that justification "cannot be resolved at this stage," Maj. Op. at 12 n.14, I would remand the case for that determination to be made.

6

## II.

In reversing and remanding, the majority has written broadly, apparently concluding that a habeas court is without power to order the release into this country of Guantanamo detainees whom the Executive would prefer to detain indefinitely, where there is no legal basis for that detention, including no contention that these petitioners are "enemy combatants" or a showing that they are even dangerous. Maj. Op. at 8. Because this court does not know if detention could be authorized here, the majority need not reach that issue. More fundamentally, its analysis compromises both the Great Writ as a check on arbitrary detention, effectively suspending the writ contrary to the Suspension Clause, art. 1, § 9, cl. 2, and the balance of powers regarding exclusion and admission and release of aliens into the country recognized by the Supreme Court to reside in the Congress, the Executive, and the habeas court. Consequently, I cannot join it.

## A.

The Executive urges this court to recognize an extra-statutory, perhaps constitutional, Executive power to detain in order to prevent an alien from entering the United States. *See* Appellants' Br. at 21. Supreme Court precedent indicates there is no such power, and the Executive's authority to exclude and remove aliens, and to detain them to effect that end, must come from an explicit congressional delegation, as the majority's citations confirm, Maj. Op. at 7. *See, e.g., Zadvydas,* 533 U.S. at 696-99*; Galvan v. Press,* 347 U.S. 522, 531 (U.S. 1954) ("As to the extent of *the power of Congress* [in regulating the entry and deportation of aliens], there is not merely 'a page of history,' but a whole volume. . . . [T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.") (citations

omitted, emphasis added); *Fong Yue Ting v. U.S.*, 149 U.S. 698, 713 (1893); *Ekiu v. United States*, 142 U.S. 651, 659-60 (1892) (the power to detain, remove, and exclude aliens "may be exercised either through treaties made by the president and senate, or through statutes enacted by congress"); *Chae Chan Ping v. United States (Chinese Exclusion Case)*, 130 U.S. 581, 603 (1889). It would be surprising under our constitutional system if the law were otherwise. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 640 (1952) (Jackson, J., concurring) ("I did not suppose, and I am not persuaded, that history leaves it open to question, at least in the courts, that the executive branch, like the Federal Government as a whole, possesses only delegated powers. The purpose of the Constitution was not only to grant power, but to keep it from getting out of hand."). Even the single apparent outlier to this line of precedent, which stated that the power to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), is no outlier at all. In *Knauff*, the Court upheld the challenged action because it was authorized by statute, albeit in "broad terms," *id.* at 543, thereby acknowledging that the political branches act on matters of exclusion and admittance through statutes and treaties.

Where the Executive claims need of a power not yet delegated in order to control entry into the country, the Supreme Court has instructed it to look to Congress for a remedy. *See Clark,* 543 U.S. at 386 ("The Government fears that the security of our borders will be compromised if it must release into the country inadmissible aliens who cannot be removed. If that is so, Congress can attend to it."); *see also* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT ACT"), Pub. L. 107-56, § 412(a), 115 Stat.

272, 350 (codified at 8 U.S.C. § 1226a(a)(6)) (providing Attorney General authority to detain terrorist aliens pursuant to removal longer than six months under certain circumstances, after the Supreme Court in *Zadvydas* found no such statutory authority then existed, 533 U.S. at 691). Other statutory justification may also exist in some cases. *See Clark*, 543 U.S. at 387 (O'Connor, J., concurring) (pointing out that the Executive "has other statutory means for detaining aliens whose removal is not foreseeable and whose presence poses security risks," including authority under the USA PATRIOT ACT). If these petitioners present "special circumstances," *Zadvydas*, 533 U.S. at 696, as the Executive appears to suggest, *see supra* n.3, Congress may, within constitutional limits, provide a remedy, *id.* at 695.

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), relied on by the majority (and the Executive), Maj. Op. at 10, is not to the contrary. That case does not stand for the proposition that any detention by the Executive is authorized if it serves to effect exclusion of an alien whom the Executive chooses not to admit. To the contrary, the Supreme Court looked to a statute then in effect and since repealed, wherein Congress had "expressly authorized" the President to exclude aliens without a hearing when the Attorney General determined entry would be prejudicial to the interests of the United States. 345 U.S. at 210. The Attorney General so determined and ordered the petitioner excluded on the basis of confidential information. *Id.* at 208. Thus, in *Mezei* the Supreme Court recognized broad Executive power not because it was inherent to the Office of the President, but because in Mezei's case that power was specifically authorized by Congress. *Id.* at 216 ("[R]espondent's right to enter the United States depends on the congressional will, and courts cannot substitute their judgment for the legislative mandate."). *Mezei* is thus another case in

9

which the Supreme Court found detention justified because it was authorized by statute.

**B.**

The majority does not adopt outright the Executive's argument that detention here is justified under an extra-statutory Executive power, but instead seems to conclude that the habeas court lacks the power to order the release of non-"enemy combatant" Guantanamo detainees from indefinite detention, even where such detention is not justified by statute. The effect, however, is much the same. To reach this conclusion, the majority has recast the traditional inquiry of a habeas court from whether the Executive has shown that the detention of the petitioners is lawful to whether the petitioners can show that the habeas court is "expressly authorized" to order aliens brought into the United States. Maj. Op. at 8. Along the way, the majority's analysis, Maj. Op. at 11-12, tends to conflate the power of the Executive to classify an alien as "admitted" within the meaning of the immigration statutes, and the power of the habeas court to allow an alien physically into the country.[6] But

_____

[6] *See Zadvydas*, 533 U.S. at 695 ("The question before us is not one of "'confer[ring] on those admitted the right to remain against the national will'" or "'sufferance of aliens'" who should be removed. Rather, the issue we address is whether aliens that the [Executive] finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States." (citation omitted)); *Mezei*, 345 U.S. at 212 (an inadmissible alien, although physically present in the United States, is deemed to be "only on the threshold of initial entry"); *see also* 8 U.S.C. § 1182(d)(5)(A); *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905) (Holmes, J.) ("The petitioner, although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate."). The district court here was presented with motions for "parole" and for release.

this analysis, like the majority's rights/remedy discussion, Maj. Op. at 9-10, ignores the very purpose of the Great Writ and its province as a check on arbitrary Executive power. The power to grant the writ means the power to order release.[7] *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody."); *see* 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *133 (Liberty is a "natural inherent right" which ought not "be abridged in any case without the special permission of law," and "[t]his induces an absolute necessity of expressing upon every commitment the reason for which it is made; that the court upon an *habeas corpus* may examine into its validity; and according to the circumstances of the case may discharge, admit to bail, or remand the prisoner."); THE FEDERALIST NO. 84, at 629 (Alexander Hamilton) (John C. Hamilton Ed. 1869) (describing habeas corpus as "a remedy for [the] fatal evil" of "arbitrary imprisonment"); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW *32 (O.W. Holmes, Jr., ed., Little Brown, & Co. 12th ed. 1873) ("[The] excellence [of habeas corpus] consists in the easy,

---

[7] As petitioners have not styled their pleadings as compensatory claims, the majority's citations to *Heck v. Humphrey*, 512 U.S. 477, 481 (1994), and *Preiser v. Rodriguez*, 411 U.S. 475, 493 (1973), which addressed monetary claims, are to that extent irrelevant. Maj. Op. at 13. So too are the citations in the majority's discussion of a right/remedy dichotomy, Maj. Op. at 9-10, *e.g., Wilkie v. Robbins*, 127 S. Ct. 2588, 2597-98 (2007), where the question was whether a new cause of action should be created to provide a remedy for a constitutional harm under *Bivens*. Likewise, the citation to *Munaf v. Geren*, 128 S. Ct. 2207 (2008) , Maj. Op. at 11, is inapposite; unlike the petitioners in *Munaf*, petitioners here are not seeking to circumvent the local law and in fact disavowed any intention to change their status under the immigration laws through habeas. Oct. 2008 Mot. Hr'g Tr. at 7.

prompt, and efficient remedy afforded for all unlawful imprisonment . . . .").

Furthermore, the majority has mischaracterized relevant precedent. The majority offers that the district court did not have the power to order that petitioners be released into the United States because such an order would impermissibly "set aside the decision of the Executive Branch" to deny petitioners release into the United States. Maj. Op. at 8. But the Supreme Court in *Clark* makes clear that a district court has exactly the power that the majority today finds lacking — the power to order an unadmitted alien released into the United States when detention would otherwise be indefinite. 543 U.S. 368, 386-87 (2005). The majority notes that *Clark*, like *Zadvydas*, 533 U.S. 678, rested on the proposition that detention was unauthorized by the immigration statutes. Maj. Op. at 10-11. But that only goes to whether detention is justified. Relevant here is that once the Supreme Court concluded the detention was unlawful, it ordered the aliens released into the United States. If the majority were correct that a habeas court, upon finding that the Executive detains indefinitely an unadmitted alien without authorization, is nonetheless powerless to order release, then the Executive in *Clark* could have continued the detention, even without legal justification. Instead, the Supreme Court held that "the petitions for habeas corpus should have been granted." 543 U.S. at 386-87.

The majority also offers that because petitioners are aliens outside the United States and have not applied for visas they are not entitled to the same due process as the aliens in *Zadvydas* and even *Clark*. Maj. Op. at 8-9, 11 (citing, *e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950)). However, in *Boumediene*, 128 S. Ct. at 2257, the Supreme Court rejected this territorial rationale as to Guantanamo, holding that detainees who were brought there involuntarily were entitled under the

12

Constitution to seek habeas relief because "[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction [and "plenary control"] of the United States." 128 S. Ct. at 2261. It held further that whether a substitute process "satisf[ied] due process standards" was not "the end [of the Court's] inquiry," because "[h]abeas corpus is a collateral process that exists, in Justice Holmes' words, to 'cu[t] through all forms and g[o] to the very tissue of the structure.'" *Id.* at 2270 (quoting *Frank v. Mangum*, 237 U.S. 309, 346 (1915) (dissenting opinion)). Furthermore, the majority does not explain how a lack of procedural due process rights in petitioners, which it asserts and uses to distinguish *Clark*, Maj. Op. at 18, would go to the power of the court, which the majority finds lacking, Maj. Op. at 11-12.

In sum, the majority aims to safeguard the separation of powers by ensuring that the judiciary does not encroach upon the province of the political branches. But just as the courts are limited to enumerated powers, so too is the Executive, and the habeas court exercises a core function under Article III of the Constitution when it orders the release of those held without lawful justification. Indeed habeas is not an encroachment, but "a time-tested device" that "maintain[s] the 'delicate balance of governance' that is itself the surest safeguard of liberty," *Boumediene*, 128 S. Ct. at 2247 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion)). The petitioners have the privilege of the writ including the right to invoke the court's power to order release, 128 S. Ct. at 2262, 2270, and the Supreme Court's decision in *Clark* shows that a habeas court has the power to order the release into the United States of unadmitted aliens whom the Executive would prefer to detain indefinitely but as to whom the Executive has exercised no lawful detention authority. The petitioners seeking release into the United States are seventeen Uighurs who come to the court as unadmitted aliens who are not "enemy combatants" or

otherwise shown by the Executive, when afforded the opportunity, to be dangerous or a threat to U.S. interests, and as to whom the Executive as yet has failed to show grounds for their detention, which appears indefinite.  Because the district court prematurely determined the petitioners were entitled to be released into the country prior to ascertaining whether the Executive, as asserted, would have lawful grounds to detain them under the immigration statutes, I concur with the judgment and would remand the case so that the district court could so ascertain.  Unlike the majority, however, I would conclude, consistent with the province of the Great Writ and the power of the political branches, that, were the district court to ascertain thereafter that petitioners' detention is not lawful and has become effectively indefinite, then under *Clark*, 543 U.S. at 386-87; *see supra* n.6, it would have the power to order them conditionally released into the country.