# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 25, 2008         Decided April 7, 2009

No. 05-5487

JAMAL KIYEMBA, NEXT FRIEND, ET AL.,
APPELLEES

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLANTS

Consolidated with
05-5489

Appeals from the United States District Court
for the District of Columbia
(No. 05cv01509)
(No. 05cv01602)

*Robert M. Loeb*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Gregory G. Katsas*, Assistant Attorney General, *Jonathan F. Cohn*, Deputy Assistant Attorney General, and *Douglas N. Letter*, *Jonathan H. Levy*, *Catherine Y. Hancock*, and *Sameer Yerawadekar*, Attorneys.

*Christopher P. Moore* argued the cause for appellees. With him on the briefs were *Jonathan I. Blackman, Rahul Mukhi, Aaron Marr Page*, *Susan Baker Manning, P. Sabin Willett, Rheba Rutkowski, Neil McGaraghan, Jason S. Pinney,* and *Gitanjali Gutierrez.*

Before: GINSBURG, GRIFFITH, and KAVANAUGH, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* GRIFFITH.

GINSBURG, *Circuit Judge*: Nine Uighurs held at Guantanamo Bay, in order to challenge their detention, petitioned the district court for a writ of habeas corpus. Asserting that they feared being transferred to a country where they might be tortured or further detained, they also sought interim relief requiring the Government to provide 30 days' notice to the district court and to counsel before transferring them from Guantanamo. The district court entered the requested orders. *Kiyemba v. Bush*, No. 1:05cv1509 (Sept. 13, 2005); *Mamet v. Bush*, No. 1:05cv1602 (Sept. 30, 2005). The Government appealed each of the orders and we consolidated its appeals. In light of the Supreme Court's recent decision in *Munaf v. Geren,* 128 S. Ct. 2207 (2008), we now reverse.

## I. Background

In granting the request for 30 days' notice of any planned transfer, the district court in *Mamet* noted the detainee's fear

of being tortured. In *Kiyemba* the district court did not advert to the detainees' fear of harm but entered an order requiring pre-transfer notice lest removal from Guantanamo divest the court of jurisdiction over the detainees' habeas petitions.

While this appeal was pending, the Congress passed the Military Commissions Act (MCA), § 7 of which provided:

> No court ... shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

Pub. L. No. 109-366, 120 Stat. 2600, 2635-36 (2006) (codified at 28 U.S.C. § 2241(e)(1)). Accordingly, we dismissed the cases for lack of subject matter jurisdiction. *Kiyemba v. Bush*, No. 05-5487 (Mar. 22, 2007). In *Boumediene v. Bush*, however, the Supreme Court held § 2241(e)(1) "effects an unconstitutional suspension of the writ" of habeas corpus. 128 S. Ct. 2229, 2274 (2008). In light of that decision, we vacated our judgment of dismissal and reinstated the Government's appeal. *Kiyemba*, No. 05-5487 (July 31, 2008).[*]

---

[*] After oral argument in the court of appeals, the Government acknowledged in the district court that it no longer views any of the present petitioners as enemy combatants, whereupon the district court ordered them released into the United States. *See In re Guantanamo Bay Detainee Litig.*, 581 F. Supp. 2d 33 (D.D.C. 2008). The Government appealed that order, which this court reversed on the ground that the political branches have "the exclusive power ... to decide which aliens may, and which aliens may not, enter the United States, and on what terms." *Kiyemba v. Obama*, 555 F.3d 1022, 1025 (2009).

## II.  Subject Matter Jurisdiction

We begin with the Government's argument that the MCA bars the district court from exercising jurisdiction in their ongoing habeas cases over claims related to the detainees' potential transfer.  The Government contends the Supreme Court in *Boumediene* held the first provision of § 7 of the MCA, 28 U.S.C. § 2241(e)(1), unconstitutional only insofar as it purported to deprive the district court of jurisdiction to hear a claim falling within the "core" of the constitutional right to habeas corpus, such as a challenge to the petitioner's detention or the duration thereof.  According to the Government's theory, because the right to challenge a transfer is "ancillary" to and not at the "core" of habeas corpus relief, § 2241(e)(1) still bars the district court from exercising jurisdiction over the instant claims.  In support of its argument, the Government invokes the rule that ordinarily a court should invalidate as little of an unconstitutional statute as necessary to bring it into conformity with the Constitution. *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) ("[W]e try not to nullify more of a legislature's work than is necessary ....  Accordingly, the normal rule is that partial, rather than facial, invalidation is the required course." (internal quotation marks omitted)).

In response, the detainees maintain it was no accident that the Court in *Boumediene* avoided making just the sort of fine distinction the Government proposes.  They point specifically to the Court's caution in *Ayotte* that "making distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a far more serious invasion of the legislative domain than we ought to undertake." *Id.* at 330 (internal quotation marks omitted).

5

We think the detainees have the better of the argument. The Court in *Boumediene* did not draw (or even suggest the existence of) a line between "core" and "ancillary" habeas issues, neither of which terms appears in the opinion (apart from the innocuous observation that "Habeas is, at its core, an equitable remedy"). Rather, the Court stated simply that § 2241(e)(1) "effects an unconstitutional suspension of the writ." 128 S. Ct. at 2274.[*] Accordingly, we read *Boumediene* to invalidate § 2241(e)(1) with respect to all habeas claims brought by Guantanamo detainees, not simply with respect to so-called "core" habeas claims.[**]

The Government next argues the second provision of MCA § 7 stripped the district court of jurisdiction. That provision eliminates court jurisdiction over "any other action against the United States or its agents relating to any aspect of the ... transfer" of a detainee. 28 U.S.C. § 2241(e)(2). This case does not come within the reach of § 2241(e)(2), however. That provision applies by its terms to "any other action" – meaning other than a petition for a writ of habeas corpus, which is the subject of § 2241(e)(1). The detainees'

[*] The Court actually referred to § 7 without specifying a particular subsection of § 2241(e) but its discussion of the Suspension Clause clearly indicates it was referring only to that part of § 7 codified at § 2241(e)(1).

[**] Thus, the Court necessarily restored the status quo ante, in which detainees at Guantanamo had the right to petition for habeas under § 2241. *See Rasul v. Bush*, 542 U.S. 466 (2004); *see also Boumediene*, 128 S. Ct. at 2266 (identifying § 2241 as "the habeas statute that would govern in MCA § 7's absence"). There is, therefore, no need to decide today whether the present petitions come within "the contours and content of constitutional habeas," Dis. Op. at 2. *See INS v. St. Cyr*, 533 U.S. 289, 301 n.13 (2001) (noting that "what the Suspension Clause protects" is a "difficult question").

claims are not in the nature of an action barred by § 2241(e)(2) because, based upon longstanding precedents, it is clear they allege a proper claim for habeas relief, specifically an order barring their transfer to or from a place of incarceration. *See Benson v. McMahon*, 127 U.S. 457, 462 (1888) (reviewing, on petition for writ of habeas corpus, claim of unlawful extradition); *Ward v. Rutherford*, 921 F.2d 286, 288 (D.C. Cir. 1990) ("[A]ctions taken by magistrates in international extradition matters are subject to habeas corpus review by an Article III district judge"); *INS v. St. Cyr*, 533 U.S. 289, 305-08 (2001) (detailing long history of reviewing deportations per petition for habeas); *In re Bonner*, 151 U.S. 242, 255-56 (1894); *Miller v. Overholser*, 206 F.2d 415, 419-20 (D.C. Cir. 1953) ("We think it has been settled since ... *Bonner* that the writ is available to test the validity not only of the fact of confinement but also of the place of confinement").

Because a potential transfer out of the jurisdiction of the court is a proper subject of statutory habeas relief, § 2241(e)(2) does not apply to and therefore does not deprive the court of jurisdiction over the claims now before us. Even "where a habeas court has the power to issue the writ," however, the question remains "'whether this be a case in which [that power] ought to be exercised.'" *Munaf*, 128 S. Ct. at 2221 (quoting *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 201 (1830)). We turn, accordingly, to the merits of the petitioners' claims.

III. Proper Grounds for Habeas Relief

A court considering a request for preliminary relief must examine four factors: (1) the moving party's likelihood of success on the merits; (2) irreparable injury to the moving party if an injunction is denied; (3) substantial injury to the

opposing party if an injunction is granted; and (4) the public interest. *Belbacha v. Bush*, 520 F.3d 452, 459 (D.C. Cir. 2008). We review for abuse of discretion the district court's weighing of these factors; insofar as "the district court's decision hinges on questions of law," however, our review is *de novo*. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998) (internal quotation marks omitted). If the moving party can show no likelihood of success on the merits, then preliminary relief is obviously improper and the appellant is entitled to reversal of the order as a matter of law. *See Munaf*, 128 S. Ct. at 2220.[*]

The detainees here seek to prevent their transfer to any country where they are likely to be subjected to further detention or to torture. Our analysis of their claims is controlled by the Supreme Court's recent decision in *Munaf*. In that case, two American citizens held in the custody of the United States military in Iraq petitioned for writs of habeas

---

[*] The detainees argue the district court in *Kiyemba* correctly issued the injunction – regardless of their ability to make a showing on the four factors for granting preliminary relief – in order to protect the court's jurisdiction over their underlying claims of unlawful detention. In defense of the district court's rationale, the detainees rely upon the All Writs Act, 28 U.S.C. § 1651 (federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions"), and upon our opinion in *Belbacha*, but they overstate the holding in that case. In *Belbacha*, we held that "when the Supreme Court grants certiorari to review this court's determination that the district court lacks jurisdiction, a court can, pursuant to the All Writs Act ... and during the pendency of the Supreme Court's review, act to preserve the status quo," but only, we added, "if a party satisfies the [four] criteria for issuing a preliminary injunction." 520 F.3d at 457. *Belbacha* therefore provides no basis for relieving the detainees of the need to satisfy the standard for a preliminary injunction, which, as discussed below, they have failed to do.

corpus, seeking to enjoin the Government from transferring them to Iraqi custody for criminal prosecution in the Iraqi courts. *Id.* at 2214-15. The Court held the district court had jurisdiction over the petitions, but that it could not enjoin the Government from transferring the petitioners to Iraqi authorities. *Id.* at 2213. As we explain below, *Munaf* precludes a court from issuing a writ of habeas corpus to prevent a transfer on the grounds asserted by the petitioners here; therefore the detainees cannot prevail on the merits of their present claim and the Government is entitled to reversal of the orders as a matter of law.[*]

A. Fear of Torture

Like the detainees here, the petitioners in *Munaf* asked the district court to enjoin their transfer because they feared they would be tortured in the recipient country. The Court recognized the petitioners' fear of torture was "of course a matter of serious concern," but held "in the present context that concern is to be addressed by the political branches, not the judiciary." *Id.* at 2225. The context to which the Court referred was one in which – as here – the record documents the policy of the United States not to transfer a detainee to a country where he is likely to be tortured. *Id.* at 2226. Indeed, as the present record shows, the Government does everything in its power to determine whether a particular country is likely to torture a particular detainee. Decl. of Pierre-Richard Prosper, United States Ambassador-at-Large for War Crimes Issues ¶¶ 4, 7-8, Mar. 8, 2005.

---

[*] For present purposes, we assume arguendo these alien detainees have the same constitutional rights with respect to their proposed transfer as did the U.S. citizens facing transfer in *Munaf*. They are not, in any event, entitled to greater rights.

The upshot is that the detainees are not liable to be cast abroad willy-nilly without regard to their likely treatment in any country that will take them. Under *Munaf*, however, the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee. 128 S. Ct. at 2226 ("The Judiciary is not suited to second-guess such determinations — determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area"). In light of the Government's policy, a detainee cannot prevail on the merits of a claim seeking to bar his transfer based upon the likelihood of his being tortured in the recipient country.[*]

The detainees seek to distinguish *Munaf* on the ground that the habeas petitioners in that case did not raise a claim under the Convention Against Torture, as implemented by the Foreign Affairs Reform and Restructuring (FARR) Act, 8 U.S.C. § 1231 note. *See Munaf*, 128 S. Ct. at 2226 n.6. That distinction is of no help to them, however, because the Congress limited judicial review under the Convention to claims raised in a challenge to a final order of removal. 8 U.S.C. § 1252(a)(4) ("Notwithstanding any other provision of law ... including section 2241 of Title 28, or any other habeas corpus provision, ... a petition for review [of an order of removal] shall be the sole and exclusive means for judicial review of any cause or claim" arising under the Convention). Here the detainees are not challenging a final order of

---

[*] As in *Munaf*, we need not address what rights a detainee might possess in the "more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." 128 S. Ct. at 2226.

removal. As a consequence, they cannot succeed on their claims under the FARR Act, and *Munaf* controls.[*]

B.  Prosecution or Continued Detention

To the extent the detainees seek to enjoin their transfer based upon the expectation that a recipient country will detain or prosecute them, *Munaf* again bars relief. After their release from the custody of the United States, any prosecution or detention the petitioners might face would be effected "by the foreign government pursuant to its own laws and not on behalf of the United States." Decl. of Matthew C. Waxman, Deputy Assistant Secretary of Defense for Detainee Affairs ¶ 5, June 2, 2005. It is a longstanding principle of our jurisprudence that "[t]he jurisdiction of [a] nation, within its own territory, is necessarily exclusive and absolute." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). As the Supreme Court explained in *Munaf*, the "same principles of comity and respect for foreign sovereigns that preclude judicial scrutiny of foreign convictions necessarily render invalid attempts to shield citizens from foreign prosecution." 128 S. Ct. at 2224 (quoting Brown, J., dissenting in part in *Omar v. Harvey*, 479 F.3d 1, 17 (D.C. Cir. 2007)). *Munaf* therefore bars a court from issuing a writ of habeas corpus to shield a detainee from prosecution and detention by another sovereign according to its laws.

---

[*] *Munaf* concerned a specific transfer, but the transferee sovereign's likely treatment of the petitioners was not material to its holding. Contrary to the statement in the dissent, the Court gave not merely "substantial weight to the [G]overnment's determination that the proposed transfer was lawful," Dis. Op. at 7; it held the judiciary cannot look behind the determination made by the political branches that the transfer would not result in mistreatment of the detainee at the hands of the foreign government. 128 S. Ct. at 2225, 2226.

Judicial inquiry into a recipient country's basis or procedures for prosecuting or detaining a transferee from Guantanamo would implicate not only norms of international comity but also the same separation of powers principles that preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign. *See id.* at 2225 ("Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments"). Furthermore, the requirement that the Government provide pre-transfer notice interferes with the Executive's ability to conduct the sensitive diplomatic negotiations required to arrange safe transfers for detainees. Prosper Decl. ¶ 10 ("Later review in a public forum of the Department's dealings with a particular foreign government regarding transfer matters would seriously undermine our ability to investigate allegations of mistreatment or torture ... and to reach acceptable accommodations with other governments to address those important concerns").[*]

---

[*] Our dissenting colleague agrees the detainees cannot prevail on a claim based upon their likely treatment by a foreign sovereign acting pursuant to its own laws. *See* Dis. Op. at 5 ("[T]he [G]overnment has submitted sworn declarations assuring the court that any transfer will result in release from U.S. authority. If the [G]overnment's representations are accurate, each transfer will be lawful."). Nor can they prevail on the ground that the foreign sovereign is an agent of the United States merely because, with respect to detainees who are — unlike the present petitioners — regarded as enemy combatants, the Government engages in a dialogue "to ascertain or establish what measures the receiving government intends to take pursuant to its own domestic laws and independent determinations that will ensure that the detainee will not pose a continuing threat to the United States and its allies,"

In short, "habeas is not a means of compelling the United States to harbor fugitives from the criminal justice system of a sovereign with undoubted authority to prosecute them." *Munaf*, 128 S. Ct. at 2223. Therefore, the district court may not issue a writ of habeas corpus to shield a detainee from prosecution or detention at the hands of another sovereign on its soil and under its authority. As a result, the petitioners cannot make the required showing of a likelihood of success on the merits necessary to obtain the preliminary relief they here seek.

---

Waxman Decl. ¶ 5. The dissent takes note of the Government's statement that "under appropriate circumstances," it transfers detainees "to the control of other governments for continued detention," *see* Dis. Op. at 6, but, as the Government explains, "[i]n all such cases ... the individual is detained, if at all, by the foreign government pursuant to its own laws and not on behalf of the United States," Waxman Decl. ¶ 5. Whether, acting pursuant to its own laws, a "foreign nation will continue detention of the petitioners," Dis. Op. at 6, is precisely the inquiry *Munaf* forbids this court from undertaking.

This case involves the Government's proposed release from U.S. custody of detainees whom the Government no longer regards as enemy combatants. It does not involve — and therefore, unlike our dissenting colleague, we express no opinion concerning — the transfer of detainees resulting in their "continued detention on behalf of the United States in places where the writ does not extend," Dis. Op. at 4. The Government represents that it is trying to find a country that will accept the petitioners and, in the absence of contrary evidence, we presume public officers "have properly discharged their official duties." *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 15 (1926). In view of the Government's sworn declarations, and of the detainees' failure to present anything that contradicts them, we have no reason to think the transfer process may be a ruse — and a fraud on the court — designed to maintain control over the detainees beyond the reach of the writ.

## IV. Conclusion

The Supreme Court's ruling in *Munaf* precludes the district court from barring the transfer of a Guantanamo detainee on the ground that he is likely to be tortured or subject to further prosecution or detention in the recipient country. The Government has declared its policy not to transfer a detainee to a country that likely will torture him, and the district court may not second-guess the Government's assessment of that likelihood. Nor may the district court bar the Government from releasing a detainee to the custody of another sovereign because that sovereign may prosecute or detain the transferee under its own laws. In sum, the detainees' claims do not state grounds for which habeas relief is available. The orders of the district court barring their transfer without notice during the pendency of their habeas cases therefore must be and are

*Vacated*.

KAVANAUGH, *Circuit Judge*, concurring: I agree with and join the persuasive opinion of the Court. Under current law, the U.S. Government may transfer Guantanamo detainees to the custody of foreign nations without judicial intervention – at least so long as the Executive Branch declares, as it has for the Guantanamo detainees, that the United States will not transfer "an individual in circumstances where torture is likely to result." *Munaf v. Geren*, 128 S. Ct. 2207, 2226 (2008).

I write separately to emphasize three points.

*First*, our disposition does not preclude Congress from further regulating the Executive's transfer of wartime detainees to the custody of other nations. Congress possesses express constitutional authority to make rules concerning wartime detainees. *See, e.g.*, U.S. CONST. art. I, § 8 ("Congress shall have Power . . . To . . . make Rules concerning Captures on Land and Water"). The constitutional text, Justice Jackson's *Youngstown* opinion, and recent Supreme Court precedents indicate that the President does not possess exclusive, preclusive authority over the transfer of detainees. *See Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring). Except perhaps in a genuine, short-term emergency, the President must comply with legislation regulating or restricting the transfer of detainees. In other words, under the relevant precedents, the President does not have power to trump legislation regarding wartime transfers in a *Youngstown* category-three situation. To be sure, there are weighty policy reasons why Congress may not seek to restrict the Executive's transfer authority or to involve the Judiciary in reviewing war-related transfers. That presumably explains why Congress has not done so. But to the extent Congress wants to place judicially enforceable restrictions on

Executive transfers of Guantanamo or other wartime detainees, it has that power.

*Second*, in the absence of a meritorious statutory claim,[1] the detainees argue that they have a constitutional due process right against "transfer to torture" – and, therefore, to judicial reassessment of the Executive's conclusion that transfer to a foreign nation's custody is unlikely to result in torture. But both *Munaf* and the deeply rooted "rule of non-inquiry" in extradition cases require that we defer to the Executive's considered judgment that transfer is unlikely to result in torture. Those precedents compel us to reject the detainees' argument that the court second-guess the Executive's conclusion in this case.

In *Munaf*, in response to a similar due process claim, the Supreme Court unanimously held that the Judiciary may not "second-guess" the Executive's assessment that transferred detainees are unlikely to be tortured by the receiving nation (in that case, by Iraq, where the detainees were to be prosecuted in Iraqi courts). 128 S. Ct. at 2226.[2] The *Munaf*

---

[1] The detainees advance a claim under the Foreign Affairs Reform and Restructuring Act, but that argument is unavailing. *See* Maj. Op. at 9-10.

[2] There is no meaningful distinction between (i) the Executive's declaration in this case that no Guantanamo detainees will be transferred to the custody of a foreign country where the Executive believes they would likely be tortured, and (ii) a similar Executive declaration with respect to a specific transfer (as in *Munaf*). The former encompasses the latter. In other words, for our purposes, the Government has represented that no detainee in this case will be transferred to a country where the Government believes it likely the detainee would be tortured. It bears emphasis that neither *Munaf* nor this case is the "more extreme case in which

decision applies here a fortiori: That case involved transfer of *American citizens*, whereas this case involves transfer of alien detainees with no constitutional or statutory right to enter the United States.

Similarly, the longstanding rule of non-inquiry in extradition cases undermines the detainees' argument. When the Executive seeks extradition pursuant to a request from a foreign nation, the Judiciary does not inquire into the treatment or procedures the extradited citizen or alien will receive in that country. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990); *see also Neely v. Henkel*, 180 U.S. 109, 122-23 (1901); *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006); *United States v. Kin-Hong*, 110 F.3d 103, 110-11 & nn. 11-12 (1st Cir. 1997); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326-27 (9th Cir. 1997); Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings*, 76 CORNELL L. REV. 1198 (1991).[3]

Therefore, with respect to international transfers of individuals in U.S. custody, *Munaf* and the extradition cases have already struck the due process balance between the competing interests of the individual and the Government.

---

the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." 128 S. Ct. at 2226.

[3] The rule of non-inquiry traditionally has not required an express executive declaration regarding the prospect of abuse by the foreign nation. After *Munaf*, courts in extradition cases presumably may require – but must defer to – an express executive declaration that the transfer is not likely to result in torture.

That balance controls here.[4] The detainees' interest in avoiding torture or mistreatment by a foreign nation is the same "matter of serious concern" at issue in *Munaf* and the extradition cases. *Munaf*, 128 S. Ct. at 2225. And on the

---

[4] In *Boumediene v. Bush*, the Supreme Court held that the Guantanamo detainees possess constitutional habeas corpus rights. 128 S. Ct. 2229, 2262 (2008). This Court has since stated that the detainees possess no constitutional due process rights. *Kiyemba v. Obama*, 555 F.3d 1022, 1026-27 (D.C. Cir. 2009). The detainees argue that they must possess due process rights if they have habeas rights. *See Hamdi*, 542 U.S. at 525-26 (plurality opinion) (discussing interaction of habeas and procedural due process); *id*. at 555-58 (Scalia, J., dissenting) (explaining linked origins of habeas and due process). And they further contend that the due process balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), applies here – rather than a test based solely on history and tradition. *See Hamdi*, 542 U.S. at 529 (plurality opinion) (applying *Mathews* test); *see also Boumediene*, 128 S. Ct. at 2283-92 (Roberts, C.J., dissenting) (applying *Mathews* test as articulated in *Hamdi*); *but see Hamdi*, 542 U.S. at 575-77 (Scalia, J., dissenting) (criticizing application of *Mathews* test); *Medina v. California*, 505 U.S. 437, 446-48 (1992) (applying history-based test). That *Mathews/Hamdi* test requires "weighing the private interest that will be affected by the official action against the Government's asserted interest, including the function involved and the burdens the Government would face in providing greater process." *Hamdi*, 542 U.S. at 529 (plurality opinion) (citation and internal quotation marks omitted).

But as explained in the opinion of the Court and in this concurring opinion, the detainees do not prevail in this case even if they are right about the governing legal framework: Even assuming that the Guantanamo detainees, like the U.S. citizens in *Munaf*, possess constitutionally based due process rights with respect to transfers and that the *Mathews/Hamdi* balancing test applies, *Munaf* and other precedents preclude judicial second-guessing of the Executive's considered judgment that a transfer is unlikely to result in torture.

other side of the ledger, the Government's interest in transferring these detainees to foreign nations without judicial second-guessing is at least as compelling as in those cases. *Cf. id.* at 2224-25 (noting significant governmental interest in detainee transfers connected to "the Executive's ability to conduct military operations abroad").

The detainees counter that the Government's transfer interest in this case involves non-enemy combatants and is therefore less important than in *Munaf* and the extradition cases; they further hint that transfer without their consent would be without legal authority. Those arguments are incorrect for two separate reasons.

To begin with, even if this were just a standard immigration case involving inadmissible aliens at the U.S. border, the governmental interest in transfer would be compelling. Like Guantanamo detainees, inadmissible aliens at the border or a U.S. port of entry have no constitutional right to enter the United States. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210-13 (1953); *see also id.* at 222-23 (Jackson, J., dissenting) (agreeing with majority that there is no constitutional right for an alien to enter the United States); *Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009). In those cases, the United States has a very strong interest in returning the aliens to their home countries or safe third countries so that they will not be detained indefinitely in facilities run by the United States – a scenario that can trigger a host of security, foreign policy, and domestic complications. *Cf.* 8 C.F.R. §§ 241.13, 241.14. That governmental interest applies at least as strongly in the case of these Guantanamo detainees.

In addition, and more fundamentally, this is a case involving transfer of wartime alien detainees. Transfers are a

traditional and lawful aspect of U.S. war efforts. When waging war, the United States captures and detains enemy combatants. The United States may hold enemy combatants for the duration of hostilities, and it of course may prosecute unlawful enemy combatants. *See Hamdi*, 542 U.S. at 518-19 (plurality opinion). At the conclusion of hostilities, the United States ordinarily transfers or releases lawful combatant detainees to their home countries. Most relevant in this case, when the United States determines during an ongoing war that an alien no longer needs to be detained or has been mistakenly detained – for example, if he is a non-combatant and not otherwise subject to confinement – the United States attempts to promptly transfer or release that detainee to his home country or a safe third country. *Cf.* Army Regulation 190-8 § 1-6(10)(c) (person who is captured and determined to be "innocent civilian should be immediately returned to his home or released"); *id.* §§ 3-11 to 3-14 (transfer and repatriation of prisoners of war); *id.* § 6-15 (transfer of civilian internees).[5]

Throughout the 20th Century, the United States transferred or released hundreds of thousands of wartime alien

---

[5] The factual complication in this case arises because the United States will not send these Uighur detainees back to their home country of China, apparently because the Executive has concluded there is a likelihood of torture by China. *See* John B. Bellinger, III, U.S. State Dep't Legal Advisor, Prisoners in War: Contemporary Challenges to the Geneva Conventions (Dec. 10, 2007). The detainees do not want to return to China for that same reason and thus support the Executive's decision. Yet these alien detainees also have no constitutional or statutory right to enter the United States. Assuming the Executive has the authority to bring them into the United States, the Executive has thus far declined to do so. And the Executive apparently has not yet found a safe third country willing to accept them.

detainees – some of whom had been held in America – back to their home countries or, in some cases, to other nations.[6] Those transfer and exchange decisions rested then – as they do now – on confidential information, promises, and negotiations. They involved predictive, expert judgments about conditions in a foreign country and related matters. Given those sensitivities, as well as the delays and burdens associated with obtaining judicial pre-approval of transfers and transfer agreements, it comes as no surprise that war-related transfers traditionally have occurred without judicial oversight. *See Boumediene*, 128 S. Ct. at 2248-49 (negotiated exchange of prisoners was "a wartime practice well known to the Framers," and "[j]udicial intervention might have complicated" those negotiations). As both history and modern practice demonstrate, the capture, detention, possible trial, and eventual transfer or release of combatants – as well as the transfer or release of those mistakenly detained during wartime – are all necessary and traditional incidents of war implicating compelling governmental interests. *See Hamdi*, 542 U.S. at 518-19 (plurality opinion); *cf.* Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001).

---

[6] *See generally* George G. Lewis & John Mewha, *History of Prisoner of War Utilization by the United States Army 1776-1945*, DEP'T OF THE ARMY PAMPHLET NO. 20-213, at 46, 177, 201-204, 240-43, 247, 258-60 (1955), http://cgsc.cdmhost.com; Raymond Stone, *The American-German Conference on Prisoners of War*, 13 AM. J. INT'L L. 406 (1919); Martin Tollefson, *Enemy Prisoners of War*, 32 IOWA L. REV. 51 (1946); Mark Elliott, *The United States and Forced Repatriation of Soviet Citizens, 1944-47*, 88 POLITICAL SCIENCE QUARTERLY 253 (1973); Howard S. Levie, *How It All Started – And How It Ended: A Legal Study of the Korean War*, 35 AKRON L. REV. 205 (2002); U.S. DEP'T OF DEFENSE, FINAL REPORT TO CONGRESS: CONDUCT OF THE PERSIAN GULF WAR 661-73, 703-08 (1992), http://www.ndu.edu.

In short, *Munaf* and the extradition cases have already weighed the relevant due process considerations regarding transfers. They have established that "the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." *Munaf*, 128 S. Ct. at 2226. And the "Judiciary is not suited to second-guess such determinations." *Id.* In light of those precedents, it would be quite anomalous for courts, absent congressional direction, to second-guess such Executive assessments in these war-related transfer cases, where the governmental interest is at least as compelling and the individual interest in avoiding mistreatment is the same. *See Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 194-95 (D.D.C. 2005) (Bates, J.); *see generally The Supreme Court, 2008 Term – Leading Cases*, 122 HARV. L. REV. 415 (2008) (analyzing *Munaf* and collecting authorities).

*Third*, I respectfully offer a few comments about the dissent.

The dissent does not address the fundamental issue raised in this appeal: whether the Constitution's Due Process Clause (or the Foreign Affairs Reform and Restructuring Act, *see* Maj. Op. at 9-10) requires judicial reassessment of the Executive's determination that a detainee is not likely to be tortured by a foreign nation – and whether, in order to ensure such a judicial inquiry, the Government must notify the district court before transfer. Rather, the dissent discusses a question that was not raised by the parties and fashions a new legal rule seemingly out of whole cloth. According to the dissent, a court must prevent a transfer of an alien detainee to a foreign nation's custody if it concludes that prosecution or detention by the foreign nation would also amount to

continued detention "on behalf of the United States." Dis. Op. at 3. The detainees did not advance that position in their 104 pages of briefing in this Court (except perhaps an ambiguous reference at the tail end of one sentence in a supplemental brief). Nor did the detainees raise the point during two lengthy oral arguments in this Court. And because the detainees did not make the argument, the Government has not been able to address and respond to the dissent's novel approach.

In any event, I respectfully disagree with the dissent's theory. The Government represents that a foreign nation's prosecution or detention in the wake of a transfer to that nation's custody would take place "pursuant to its own laws." Waxman Decl. ¶ 5. Under the principles of *Munaf*, that declaration suffices to demonstrate that the proposed transfer of an alien to the custody of a foreign nation is not the same thing as the U.S. Government's maintaining the detainee in U.S. custody.[7]

The dissent cites no precedent – none – requiring or allowing a court to review a proposed transfer and assess whether custody of such an alien by a foreign nation would somehow also amount to custody "on behalf of the United States." The dearth of citations is noteworthy, particularly given that transfers of inadmissible or removed aliens to the custody of foreign nations have long occurred in the immigration context.

---

[7] A quite different issue arises, of course, when the United States maintains physical custody of an alien detainee but moves him after he has filed his habeas petition from a place where habeas applies (such as Guantanamo) to a place where the writ does not extend for aliens (such as a U.S. military base in Germany). *Cf. Rumsfeld v. Padilla*, 542 U.S. 426, 440-41 (2004); *Ex parte Endo*, 323 U.S. 283, 306 (1944).

Furthermore, the dissent does not define or explain its proposed standard. What does "on behalf of the United States" mean in the context of a foreign nation's custody of an alien detainee? Does that concept apply to any negotiated transfer of an alien detainee? Does the dissent mean to prevent transfer from Guantanamo whenever the United States seeks or becomes aware of prosecution or detention of an alien by the receiving country pursuant to that country's laws? The dissent does not say.

The dissent in places seems to imply that an alien who is not an enemy combatant is perforce not dangerous, as that term is used in immigration practice, and that prosecution or detention by a foreign nation after transfer therefore would be improper, at least if the United States were aware of or encouraged it beforehand. But no authority is cited to support such a conclusion or the extraordinary judicial role it portends in connection with the Nation's foreign and immigration policies and international negotiations. *Cf. Munaf*, 128 S. Ct. at 2223 ("Habeas does not require the United States to keep an unsuspecting nation in the dark when it releases an alleged criminal insurgent within its borders."); *Demore v. Kim,* 538 U.S. 510, 522 (2003) ("any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government") (internal quotation marks omitted); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) ("judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (internal quotation marks omitted).

Moreover, the dissent's theory necessarily would require some judicial review of a foreign nation's legal practices and procedures. But that would contravene the longstanding principle reiterated by the Supreme Court in *Munaf*: "Even with respect to claims that detainees would be denied constitutional rights if transferred, we have recognized that it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." 128 S. Ct. at 2225.

Nor does the dissent explicate how its regime would work procedurally. For instance, would the Judiciary require questioning of the American and foreign officials who negotiated the transfer? Would it mandate disclosure of confidential nation-to-nation documents? Presumably so. But absent congressional direction otherwise, courts traditionally are wary of wading so deeply into this Nation's negotiations and agreements with foreign nations. *Cf. Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988); *Dames & Moore v. Regan*, 453 U.S. 654 (1981).

Courts have a responsibility to decide war-related cases with as much clarity and expedition as possible. Especially in this sensitive area, our holdings and opinions should strive to be readily understandable to the political branches that have to make critical wartime decisions. The dissent's uncertain "on behalf of" standard likely would create years of case-by-case litigation as the courts and the political branches grapple with what it means and how it applies to a given U.S. negotiation with a foreign nation about transfer of a wartime alien detainee.

In my respectful judgment, the dissent's theory does not advance a proper ground, absent congressional direction, for a judge to prevent the transfer of Guantanamo detainees to the

custody of a foreign nation. And thus I fully agree with the opinion of the Court that the dissent's argument provides no basis in this case for the court to second-guess the Executive's proposed transfer of these alien detainees. *See* Maj. Op. at 11-12 n.*.

\* \* \*

The opinion of the Court correctly concludes that, under current law, the U.S. Government may transfer Guantanamo detainees to the custody of foreign nations without judicial intervention – at least so long as the Executive Branch declares, as it has for the Guantanamo detainees, that the United States will not transfer "an individual in circumstances where torture is likely to result." *Munaf*, 128 S. Ct. at 2226.

GRIFFITH, *Circuit Judge*, concurring in the judgment in part and dissenting in part: Nine detainees ask us to affirm district court orders requiring the government to provide thirty days' notice of their transfers from Guantanamo Bay. I share the majority's concern that requiring such notice limits the government's flexibility in a sensitive matter of foreign policy. Nevertheless, in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Supreme Court rejected this court's view of the reach of the writ of habeas corpus and extended its protections to those held at Guantanamo Bay. Since at least the seventeenth century, the Great Writ has prohibited the transfer of prisoners to places beyond its reach where they would be subject to continued detention on behalf of the government. Because this protection applies to the petitioners, the critical question before us is what process a court must employ to assess the lawfulness of their proposed transfers. Based on its reading of *Munaf v. Geren*, 128 S. Ct. 2207 (2008), the majority finds sufficient the government's representations that no transfer will result in continued detention on behalf of the United States. I write separately because I do not believe *Munaf* compels absolute deference to the government on this matter, and I believe the premise of *Boumediene* requires that the detainees have notice of their transfers and some opportunity to challenge the government's assurances. Accordingly, I would affirm the district court orders.

## I.

I agree with the majority that the district court has subject matter jurisdiction to hear the detainees' challenges to their transfers. I am less certain than the majority, however, that there remains a statutory basis to hear these claims after *Boumediene*. The majority opinion in *Boumediene* said nothing about whether statutory habeas for the Guantanamo detainees survived the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, and at least three Justices were of the view it did not. *See Boumediene*, 128 S.

Ct. at 2278 (Souter, J., concurring, joined by Ginsburg & Breyer, JJ.) (noting that Congress "eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all"). Statutory habeas may in fact exist for these detainees and cover claims against unlawful transfer, but for now this remains an open question, and the Constitution provides a more sure footing for jurisdiction.

The bar against transfer beyond the reach of habeas protections is a venerable element of the Great Writ and undoubtedly part of constitutional habeas. "[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (quoting *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). Because the Habeas Corpus Act of 1679 "was the model upon which the habeas statutes of the 13 American Colonies were based," *Boumediene*, 128 S. Ct. at 2246; *see* Dallin H. Oaks, *Habeas Corpus in the States, 1776–1865*, 32 U. CHI. L. REV. 243, 252 (1965) (explaining the "close conformity of most state legislation to the English Habeas Corpus Act of 1679"), the Supreme Court has looked to the 1679 Act to determine the contours and content of constitutional habeas, *see, e.g.*, *Boumediene*, 128 S. Ct. at 2245–47; *Hamdi v. Rumsfeld*, 542 U.S. 507, 557–58 (2004) (Scalia, J., dissenting); *Peyton v. Rowe*, 391 U.S. 54, 58–59 (1968). Section 12 of the 1679 Act included a prohibition against the transfer of prisoners to places where the writ did not run. *See* Habeas Corpus Act, 1679, 31 Car. 2, c.2, § 12 (Eng.) ("[N]o subject . . . may be sent . . . into parts, garrisons, islands or places beyond the seas . . . within or without the dominions of his Majesty . . . ."); *see also Boumediene*, 128 S. Ct. at 2304 (Scalia, J., dissenting) ("The possibility of evading judicial review through such spiriting-away was eliminated, not by expanding the writ abroad, but by forbidding (in Article XII

of the Act) the shipment of prisoners to places where the writ did not run or where its execution would be difficult."); Oaks at 253 ("The act also prohibited sending persons to foreign prisons (§ 12)."). Because *Boumediene* extended constitutional habeas to the Guantanamo detainees, *see* 128 S. Ct. at 2240 (holding that petitioners "have the constitutional privilege of habeas corpus, a privilege not to be withdrawn except in conformance with the Suspension Clause"), we should acknowledge that jurisdiction to hear the petitioners' claims against unlawful transfer—a fundamental and historic habeas protection—is grounded in the Constitution.

## II.

Transfer to continued detention on behalf of the United States in a place where the writ does not reach would be unlawful and may be enjoined. The question we must consider is what process courts must use to determine whether the government's proposed transfers run afoul of that bar. The majority holds that the district court must defer to the Executive's sworn representations that transfer to the physical custody of a foreign government will not involve continued detention on behalf of the United States. Majority Op. at 12–13. But this will leave the petitioners without any opportunity to challenge the accuracy of the government's sworn declarations. Although prudential concerns may justify some flexibility in fashioning habeas relief, *see Boumediene*, 128 S. Ct. at 2267 (noting that "common-law habeas corpus was, above all, an adaptable remedy"), such innovations must not strip the writ of its essential protections. *See id.* at 2276 ("Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ.").

Fundamental to a prisoner's habeas rights is the government's duty to appear in court to justify his detention. At its most basic level, habeas "protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account." *Id.* at 2247; *see Peyton*, 391 U.S. at 58 ("The writ of habeas corpus is a procedural device for subjecting executive, judicial, or private restraints on liberty to judicial scrutiny. Where it is available, it assures among other things that a prisoner may require his jailer to justify the detention under the law."). To vindicate the detainees' habeas rights, *Boumediene* requires the court to "conduct a meaningful review" of the government's reasons for the detention, which includes, at the very least, the rudimentaries of an adversary proceeding. 128 S. Ct. at 2268–69 (for the "writ [to] be effective . . . [t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain," typically through "a fair, adversary proceeding"); *see also id.* at 2269 (identifying as a critical deficiency in the CSRT process the "constraints upon the detainee's ability to rebut the factual basis for the Government's assertion that he is an enemy combatant"). Calling the jailer to account must include some opportunity for the prisoner to challenge the jailer's account.

Here the nine detainees claim their transfers may result in continued detention on behalf of the United States in places where the writ does not extend, effectively denying them the habeas protections *Boumediene* declared are theirs. *See, e.g.*, Appellees' Supp. Br. at 4–5 (arguing that habeas "extends to ensuring that any proposed 'release'" would not result in "continued unlawful detention in a location beyond the jurisdiction of the district court . . . in coordination with[] or at the behest of the United States"); Appellees' Supp. Resp. Br. at 5–6; Application for Prelim. Inj. at 7, 9–10, *Kiyemba v.*

*Bush*, No. 05-1509 (D.D.C. Sept. 9, 2005). The stakes of unlawful custody, which led the Court in *Boumediene* to extend habeas protections to the detainees in the first place, are no higher than the stakes of unlawful transfer. Indeed, because an unlawful transfer will deny the detainees any prospect of judicial relief, protecting their habeas rights in this context is vital.

It is significant that the government has submitted sworn declarations assuring the court that any transfer will result in release from U.S. authority. If the government's representations are accurate, each transfer will be lawful, for in habeas the only relevant judicial inquiry about a transfer is whether it will result in continued detention on behalf of the United States in a place where the writ does not run. But as we recently noted in another case involving the scope of habeas protections for detainees at Guantanamo Bay, a "naked declaration cannot simply resolve the issue." *Al-Odah v. United States*, No. 05-5117, slip op. at 10 (D.C. Cir. Mar. 6, 2009) (per curiam) (rejecting "the government's suggestion that its mere certification—that the [classified] information redacted from the version of the [document] provided to a detainee's counsel do[es] not support a determination that the detainee is *not* an enemy combatant—is sufficient to establish that the information is not material" (internal quotation marks omitted)); *see id.* at 11 ("[I]t is the [habeas] court's responsibility to make the materiality determination itself."). Critical to ensuring the accuracy of the government's representations is an opportunity for the detainees to challenge their veracity. The rudimentaries of an adversary proceeding demand no less. *See Boumediene*, 128 S. Ct. at 2273 ("If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court."). When an individual entitled to habeas

protections faces the prospect of continued detention—be it by the United States at Guantanamo Bay or on its behalf after transfer to a foreign nation—he must be afforded some opportunity to challenge the government's case.

Relying solely on the government's sworn declaration and despite the petitioners' claims to the contrary, the majority insists that this case is not about possible continued detention by a foreign nation on behalf of the United States. Majority Op. at 11–12. But the majority makes too much of what the government has actually said. The government has stated only that transfer to a foreign nation will result in release of the detainees from the physical custody of the United States. *See* Declaration of Matthew C. Waxman, Deputy Assistant Sec'y of Def. for Detainee Affairs 2–3 (June 2, 2005). The declaration expressly left open the possibility that a foreign nation will continue detention of the petitioners. *See id.* at 2 ("[T]he United States also transfers GTMO detainees, under appropriate circumstances, to the control of other governments for continued detention . . . ."). The possibility of continued detention by a foreign nation on behalf of the United States after a transfer is the very issue we must address. Although the status of these detainees has been put to an adversarial process, whether their transfers will be lawful has not. I do not see how the court can safeguard the habeas rights *Boumediene* extended to these detainees without allowing them to challenge the government's account.[1]

---

[1] Because this case should be governed by *Boumediene*'s extension to the detainees of habeas protections that include the bar against unlawful transfer, I view the issues of interest to Judge Kavanaugh in his concurring opinion as inapposite. For example, whether the Due Process Clause of the Fifth Amendment reaches these detainees is simply not part of the inquiry required in this case. The critical issue is whether the petitioners' habeas rights permit them to offer evidence that their proposed transfers will result in

*Munaf* is not to the contrary. The majority makes much of its language that courts may not "second-guess" the government's determinations, but it overlooks a significant difference between that case and ours: the *Munaf* petitioners knew in advance that the government intended to transfer them to Iraqi authorities and had the opportunity to demonstrate that such a transfer would be unlawful. There was no need for the *Munaf* Court to consider an issue at the center of this dispute: whether notice is required to prevent an unlawful transfer. In considering the *Munaf* petitioners' request to enjoin their transfers, the district court had the benefit of competing arguments from the petitioners and the government for each specific transfer. *See* 128 S. Ct. at 2226 (emphasizing that the government had considered and determined that the petitioners, Shawqi Ahmad Omar and Mohammad Munaf, would be treated adequately by Iraq's Justice Ministry and the prison where they would be held); *see also Omar v. Harvey*, 416 F. Supp. 2d 19, 28 (D.D.C. 2006) (stating petitioner's reasons for seeking an injunction barring transfer); Petition for Writ of Habeas Corpus at 7, *Munaf v. Harvey*, No. 06-1455 (D.D.C. Aug. 18, 2006) (same). Although the Supreme Court rightly gave substantial weight to the government's determination that the proposed transfer was lawful, the petitioners were at least permitted to argue otherwise. The *Kiyemba* petitioners should be afforded the same opportunity.

Other factual and legal differences limit *Munaf*'s applicability to our case. Critical to *Munaf*'s holding was the need to protect Iraq's right as a foreign sovereign to prosecute the petitioners. *See* 128 S. Ct. at 2221 ("[O]ur cases make

---

continued detention by a foreign nation on behalf of the United States.

clear that Iraq has a sovereign right to prosecute Omar and Munaf for crimes committed on its soil."). No such interest is implicated here. The Court also emphasized Iraq's status as an ally and the fact that the petitioners had voluntarily traveled to Iraq to commit crimes during ongoing hostilities. *See id.* at 2224–25. Again, nothing similar is involved in this case. Perhaps most important, the *Munaf* petitioners sought a unique type of relief, as the Court stressed:

> [T]he nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate in these cases. Habeas is at its core a remedy for unlawful executive detention. . . . At the end of the day, what petitioners are really after is a court order requiring the United States to shelter them from the sovereign government seeking to have them answer for alleged crimes committed within that sovereign's borders.

*Id.* at 2221. Given the significant differences between the circumstances of *Munaf* and this case, we are not required to hold that courts are foreclosed from exercising their habeas powers to enjoin a transfer without some opportunity for a detainee to challenge the government's representation that his transfer will be lawful.

### III.

In the end, I would add only one element to the process the majority concludes is sufficient for considering the petitioners' transfer claims. But it is, I believe, a fundamental element called for by the Great Writ. The constitutional habeas protections extended to these petitioners by *Boumediene* will be greatly diminished, if not eliminated, without an opportunity to challenge the government's assurances that their transfers will not result in continued

detention on behalf of the United States. Accordingly, I respectfully dissent.